IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| MARK ANTHONY MELENDEZ, Institutional ID No. 2344000 | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 5:21-CV-060-BQ |
| DOE DEFENDANT NO. 1, *et al.*, | § § § | |
| Defendants. | § § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Proceeding pro se and *in forma pauperis*, Plaintiff Mark Anthony Melendez has filed this action under 42 U.S.C. § 1983, claiming violations of his constitutional rights during his October 16, 2019, arrest. ECF No. 1. Melendez filed his Complaint on March 10, 2021, and the United States District Judge transferred this case to the undersigned United States Magistrate Judge for further proceedings. ECF Nos. 1, 9. The undersigned thereafter reviewed Melendez's Complaint, as well as authenticated records from Lubbock County and the City of Lubbock, and ordered Melendez to complete a questionnaire pursuant to *Watson v. Ault*, 525 F.2d 886, 892–93 (5th Cir. 1976).[1] ECF No. 13. Melendez timely completed and returned the questionnaire. ECF No. 14.

Not all parties have consented to proceed before the undersigned magistrate judge. ECF No. 6. In accordance with the order of transfer, the undersigned makes the following findings, conclusions, and recommendations to the United States District Judge.

---

[1] The Court did not find it feasible to hold a hearing in accordance with *Spears v. McCotter*, 766 F.2d 179, 181–82 (5th Cir. 1985) due to the COVID-19 pandemic.

I.  **Standard of Review**

A court must dismiss a complaint filed *in forma pauperis* by a prisoner against a government entity or employee if the court determines that the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B) (2017); *see also* § 1915A(b) (applying section to any suit by a prisoner against certain governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*). A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint has no arguable basis in fact if it rests upon clearly fanciful or baseless factual contentions, and similarly lacks an arguable basis in law if it embraces indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005). When analyzing a prisoner's complaint, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated prison records. *See Wilson v. Barrientos*, 926 F.2d 480, 483–84 (5th Cir. 1991); *see also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (explaining that responses to a questionnaire or testimony given during an evidentiary hearing are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may dismiss prisoners' *in forma pauperis* claims as frivolous based on "medical and other prison records if they are adequately identified or authenticated" (internal quotation marks omitted)).

In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). And while courts hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, such

plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id.* (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

## II. Discussion

### A. Melendez's claims and the authenticated records.

Melendez asserts claims against three Doe Defendants: the arresting officer (Doe Officer); a doctor who examined him after his arrest (Doe Doctor); and various media outlets, including KLBK, News Channel 11 (KCBD), and the Lubbock Avalanche Journal (Lubbock Avalanche). Compl. 1, 3, ECF No. 1; Questionnaire 1, 3–4, ECF No. 14.[2] Melendez alleges that Doe Officer used excessive force during Melendez's October 16, 2019, arrest. Compl. 5; Questionnaire 1–2. The authenticated records reflect that while on patrol, Lubbock Police Department (LPD) Officer Curtis Wadkins, who Melendez does not specifically identify as a defendant, observed Melendez driving a white pickup truck that had been used in the theft of ATM machines and other crimes. Melendez asserts, and the records show, that Officer Wadkins began following him in Wadkins's unmarked vehicle and that eventually a chase ensued involving numerous other LPD officers. Compl. 5, 8 ("[The officer] then turns on his red and blue lights so I take off from him not knowning [sic] what I did wrong. So I led them to a high speed chase [through] the neighbor hood [sic] . . . ."). The vehicle pursuit ended when Melendez's truck collided with another vehicle, but Melendez then exited the truck and fled on foot. *Id.* at 8–9 (describing the collision and stating that he "jumped out and ran").

---

[2] Page citations to Melendez's pleadings refer to the electronic page number assigned by the Court's electronic filing system.

Doe Officer's[3] dash camera video footage reflect, and Melendez admits, that Melendez ran through an alley. DC 3:10–:24;[4] *see* Compl. 9. The video shows that Melendez attempted to climb or push through a fence but fell, and got up and tried running but tripped and fell again. DC 3:16–:23. According to Melendez, however, he "gave up a few stops running, [l]ayed [sic] on the ground, and yelled 3x 'I give up' to" Doe Officer. Compl. 9 (cleaned up); *see id.* at 5. But Melendez also asserts that as Doe Officer ran toward him, he "tr[ied] to pick [himself] up so [he could] get on [his] knees w/ [his] hands behind [his] head still yelling" that he surrendered. *Id.*; *see* Questionnaire 2 (denying that he attempted to run as Doe Officer moved to apprehend him, claiming that his "mind wuz [sic] telling [him] to give up at that moment").

The video footage reflects that Melendez indeed attempted to get up a second time, which directly refutes Melendez's contention that he "gave up." DC 3:23–:24. As Melendez tried to get up a second time, Doe Officer exited his patrol truck and began handcuffing Melendez. DC 3:23–:48; BWC 0:18–:44. At the time Doe Officer made physical contact, Melendez's left hand was on the ground propping-up his body, while his right arm was raised at a 45-degree angle with his hand near his ear. DC 3:24–:28. Thus, the video also directly refutes Melendez's contention that he maintained his hands behind his head when he tried to get on his knees. *Id.* The video shows that Doe Officer had to forcibly move Melendez's right arm behind his body to handcuff him. DC 3:29–:34; *see* BWC 0:18–:44. It took Doe Officer approximately twenty seconds to handcuff Melendez. DC 3:29–:48.

---

[3] The authenticated records indicate that Sergeant Christopher Miller is the officer involved in the incident of which Melendez complains. Nevertheless, the Court refers to the officer as Doe because that is how Melendez identifies him.

[4] Citations to Doe Officer's body-worn camera footage are indicated by "BWC" and dash camera citations are reflected as "DC."

Melendez contends that as Doe Officer handcuffed him, Doe Officer kneed Melendez in the right side of his head, which amounted to excessive force. Compl. 5, 9; Questionnaire 1–2. As a result of being kneed in the head, Melendez avers that he continues to suffer "massive headaches."[5] Questionnaire 1; *see* Compl. 10.

After the incident, an ambulance transported Melendez to University Medical Center (UMC) in Lubbock, Texas. Compl. 9–10. There, Melendez alleges that he reported to an emergency room doctor, i.e., Doe Doctor, that he "had a head problem," as well as shoulder pain and an abrasion on his left knee. Questionnaire 3. According to Melendez, however, Doe Doctor did not provide him any medical treatment and merely looked "in [Melendez's] eyes and [then told officials]" he was "good" for transport to jail. Compl. 5, 10. Melendez believes that Doe Doctor should have ordered an "MRI/catscan/or Xrays just incase [sic all]." *Id.* at 5. But Melendez concedes that he did not communicate any specific facts to Doe Doctor concerning his purported injuries. Questionnaire 3 (stating that he did not communicate with Doe Doctor). Because of Doe Doctor's alleged lack of adequate medical care, Melendez asserts that "till [sic] this day [he] ha[s] bad migraines and still [does not] understand [wh]y." Questionnaire 4.

Finally, Melendez contends that KLBK, KCBD, and Lubbock Avalanche—all Lubbock media outlets—defamed his character by reporting on October 16, 2019, that he was a suspect in several ATM machine robberies and referring to him as the "ATM Bandit." Compl. 5; Questionnaire 4. Melendez alleges that this false information "caused [him] to not be able to find a job once [he] was released" from jail." Compl. 5. Melendez seeks money damages for the alleged constitutional violations. *Id.* at 4.

---

[5] Although Melendez references other injuries in connection with his medical care claim (e.g., shoulder pain, an abrasion on his knee), Melendez does not attribute them to Doe Officer's actions. *See* Questionnaire 1.

5

**B. Melendez has not pleaded adequate facts demonstrating Doe Officer violated his Fourth Amendment rights by using force excessive to the need in the course of making the arrest.**

Melendez's use of force claim arises under the Fourth Amendment because he sustained an alleged injury when Doe Officer effectuated his October 16, 2019, arrest. *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Today we make explicit what [has been] implicit . . . and hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."); *Williams v. Bramer*, 180 F.3d 699, 704 (5th Cir. 1999) (holding that plaintiff asserted a valid Fourth Amendment claim where he alleged defendant maliciously choked him after arresting plaintiff and searching his vehicle, but prior to transporting him to jail). To sufficiently state an excessive force claim, an arrestee must demonstrate that he suffered: "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Hamilton v. Kindred*, 845 F.3d 659, 662 (5th Cir. 2017) (quoting *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)).

"The objective reasonableness of the force . . . depends on the facts and circumstances of the particular case, such that the need for force determines how much force is constitutionally permissible." *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008). In evaluating the objective reasonableness of an officer's use of force, courts consider the following non-exclusive criteria, known as the *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Darden v. City of Fort Worth*, 880 F.3d 722, 728–29 (5th Cir. 2018) (quoting *Graham*, 490 U.S. at 396). An arrestee must allege more than de minimis

6

injury to justify an excessive force finding, and the injury "must be evaluated in the context in which the force was deployed." *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) (citing *Williams*, 180 F.3d at 703).

Melendez concedes that after engaging officers in a "high speed chase," he then fled on foot through an alley. Compl. 8–9; *see* DC 3:10–:24. The video shows that Melendez attempted to climb or push through a fence but fell, and got up and tried running but tripped and fell again. DC 3:16–:23. According to Melendez, he did not fall but "gave up a few stops running, [l]ayed [sic] on the ground, and yelled 3x 'I give up' to" Doe Officer. Compl. 9 (cleaned up); *see id.* at 5. The dash-camera video does not have sound, and Doe Officer turns the sound on the body-worn camera after Melendez is no longer resisting. The Court therefore accepts as true Melendez's assertions that he verbally surrendered and his "mind [told him] to give up." Questionnaire 2; Compl. 5, 9. But Melendez's own pleadings and the video footage clearly refute Melendez's contention that he ceased flight (other than falling) at any point prior to Doe Officer making physical contact with Melendez. DC 3:16–:29.

Reading Melendez's allegations as a whole, construing all facts in his favor, and considering those portions of the video footage that directly refute Melendez's assertions, the Court construes Melendez's contentions as follows: (1) he fled on foot from officers; (2) he fell to the ground; (3) he yelled that he was giving up; (4) he attempted to get on his knees with his right hand at a forty-five degree angle near his head while yelling that he surrendered; (5) Doe Officer ran toward Melendez and kneed him on the right side of his head as Doe tried to handcuff him;[6] (6) as Doe Officer handcuffed Melendez, Doe placed his knee on Melendez's back and

---

[6] Based on the video footage, the Court expresses serious doubt as to whether Doe Officer intentionally struck Melendez with his knee. The video footage reflects a rapid series of events in which Doe Officer ran to apprehend Melendez, who continued to flee. DC 3:16–:34. As Doe Officer made physical contact, Melendez fell backward and

advised Melendez that he was under arrest. Compl. 5, 8–9; Questionnaire 1–2; *see* DC 3:10–:48. As a result of being kneed in the head, Melendez avers that he continues to suffer "massive headaches." Questionnaire 1; *see* Compl. 10.

The Court finds that the facts alleged by Melendez fail to satisfy the required third element for demonstrating excessive force, i.e., that the force applied was objectively unreasonable. Specifically, two of the three *Graham* factors weigh significantly in Doe Officer's favor and dictate a finding that the single knee strike was not objectively unreasonable.

As to the first factor—the severity of the crime at issue—officers believed that the truck driven by Melendez fit the description of the vehicle used in stealing ATM machines and committing other crimes. Melendez denies that he is the "ATM Bandit," however, and the facts alleged make it unclear what crime, if any, Melendez had committed when Doe and other officers first attempted to pull over Melendez. Although Melendez's subsequent actions—including leading the officers on a "high speed chase" and fleeing on foot—significantly escalated the gravity of the circumstances surrounding the incident and the degree of force appropriate under those conditions, Melendez was, at best, a suspect. *See, e.g., Brown v. Lynch*, 524 F. App'x 69, 80 (5th Cir. 2013) (per curiam) (applying *Graham* factors and noting that first factor favored plaintiff, where defendant detained him on "suspicion that he had sold marijuana on some prior date—not a trivial offense, but also not one to put any person in real or immediate danger"); *Molina v. Collin Cnty.*, No. 4:17-CV-00017, 2017 WL 5441833, at *3 (E.D. Tex. Nov. 14, 2017) (concluding the first *Graham* factor favored arrestee, where officers had not witnessed him commit a crime and arrestee was merely a suspect to a crime). The Court therefore finds that the first *Graham* factor favors Melendez, albeit only slightly.

---

Doe Officer slid on his knees toward Melendez. *Id.* Nevertheless, the Court accepts as true, at this stage of the proceedings, Melendez's assertion that Doe Officer's knee strike amounted to an intentional use of force.

The second and third *Graham* factors, however, strongly weigh in Doe Officer's favor and dictate a finding that the force applied was not objectively unreasonable. The apprehension of a fleeing suspect necessarily involves some degree of physical contact. *Bush*, 513 F.3d at 502 (observing that "the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it" (internal quotation marks and citation omitted)). Moreover, due to Melendez's flight and resistance, Doe Officer had not been able to determine whether Melendez possessed a weapon, thereby causing him to pose a risk to officer and public safety and providing further justification for the use of some degree of force. *See, e.g., Studzinski v. City of Austin*, No. A-19-CV-709-ML, 2020 WL 8674122, at *7 (W.D. Tex. Dec. 28, 2020) (weighing *Graham* factors in determining whether use of force was constitutionally unreasonable, including the fact that the suspect had not been searched and was suspected of having a weapon); *Breland v. City of Wiggins*, No. 1:17cv276-HSO-JCG, 2019 WL 1281249, at *9 (S.D. Miss. Mar. 20, 2019) (finding that defendant had objectively reasonable grounds to believe plaintiff posed an immediate threat to officers' safety, where plaintiff dug through pockets of jacket, which had not been searched, and actively resisted defendant's efforts to confiscate and search the jacket).

Further, the Court finds that, even accepting as true Melendez's assertion that he verbally surrendered, Melendez's other actions—attempting to get on his knees and not immediately surrendering his hands—amounted to attempted flight. The video supports this finding, reflecting that despite Doe Officer exiting his patrol vehicle, Melendez did not discontinue his movement or immediately surrender his hands to Doe. DC 3:24–:29. Because the video shows that Melendez continued attempting to flee by rising to his knees, the Court concludes the third *Graham* factor also weighs in Doe Officer's favor. *Cf. Griggs v. Brewer*, 841 F.3d 308, 313–14 (5th Cir. 2016) (rejecting plaintiff's argument "that he was not resisting, but merely lost his balance" because

given the circumstances—"a late-night traffic stop involving a clearly drunk and obstinate individual, lurching to the side"—"would, to a reasonable police officer, amount to resistance to arrest"); *Omokaro v. Whitemyer*, No. 98-10903, 1999 WL 1338438, at *2 (5th Cir. Dec. 30, 1999) (observing that "even by [plaintiff's] account, a reasonable officer could have perceived his reaction to the mace–rolling around, screaming and yelling–as threatening or resisting arrest in such a way as to demand physical force to handcuff him"); *Pinder v. Skero*, 375 F. Supp. 3d 725, 743 (S.D. Tex. 2019) (finding third *Graham* factor favored defendant officer, where summary judgment evidence reflected that plaintiff, although not actively resisting arrest, "was noncompliant" and therefore "a reasonable officer could have perceived [plaintiff] to be resisting arrest").

In sum, Melendez engaged in dangerous conduct that posed an immediate threat to public and officer safety through his efforts to resist arrest—leading officers on a high-speed chase, fleeing on foot after being involved in a motor vehicle accident with an innocent citizen, and continuing to attempt flight despite an officer's effort to apprehend him. On balance, Doe Officer's purported use of a single knee strike as he tried to handcuff Melendez does not amount to excessive force. The undersigned therefore recommends dismissal of Melendez's excessive force claim against Doe Officer.

### C. Melendez has failed to state a claim for deliberate indifference to his serious medical needs.

The Constitution requires that prison officials provide adequate medical care.[7] *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). An inmate or detainee seeking to establish a

---

[7] Because Melendez was an arrestee or detainee at the time of his claim, his rights derive from the Fourteenth Amendment, not the Eighth Amendment. *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (stating that pretrial detainee's rights "flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment"). Nevertheless, the standard for deliberate indifference to serious medical needs is

Fourteenth Amendment violation in regard to medical care must allege facts showing that prison officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (explaining that because "only the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs" (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991))). Deliberate indifference "is an extremely high standard to meet" (*Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (internal quotation marks and citation omitted)) and requires satisfaction of both an objective and a subjective component. *Rogers*, 709 F.3d at 410. An inmate must first prove objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). As to the subjective component, an official acts with deliberate indifference only where he (1) "knows [the] inmate[] face[s] a substantial risk of serious harm" and (2) "disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Gobert*, 463 F.3d at 346; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (stating that prison official is not liable for denial of medical treatment unless he knows of and disregards an excessive risk to inmate health or safety).

An official's "failure to alleviate a significant risk that the official should have perceived, but did not, is insufficient to show deliberate indifference." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (alterations and internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 838). "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, an official "must both be aware of facts from

---

essentially the same for both pretrial detainees and post-conviction prisoners; thus, cases applying the Eighth Amendment are still relevant to the Court's analysis.

11

which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837); *see Lawson v. Dallas Cnty.*, 286 F.3d 257, 262 (5th Cir. 2002) (holding that deliberate indifference is a "subjective inquiry," and inmate must show prison official was actually aware of risk of harm and consciously ignored it).

Allegations of malpractice, negligence, or unsuccessful treatment fail to establish deliberate indifference. *Gobert*, 463 F.3d at 346. Similarly, an inmate's disagreement with the medical treatment provided does not give rise to a constitutional claim (*Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)), and a delay in delivering medical care creates constitutional liability only where the alleged deliberate indifference results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993). In sum, an inmate must demonstrate that prison staff "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" to state a viable Eighth Amendment claim for deliberate indifference to serious medical needs. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

Initially, the Court notes that to state a viable § 1983 claim, a plaintiff must demonstrate that the defendant acted under color of state law when depriving him of a constitutional right. *See* 42 U.S.C. § 1983; *West v. Adkins*, 487 U.S. 42, 48 (1988). In certain circumstances, a private party's conduct may constitute state action, including when: (1) the party performs a function traditionally within the exclusive province of the state; (2) the state exercised coercive power over the party such that conduct is deemed that of the state; or (3) the party conspired with a state actor. *See Richard v. Hoechst Celanese Chem. Grp., Inc.*, 355 F.3d 345, 352 (5th Cir. 2003).

Melendez has not pleaded any facts suggesting that Doe Doctor was performing an activity governmental in nature such that he can be considered a state actor. Compl. 5, 10. Standing alone, Melendez's assertion that EMS personnel transported him "to the [emergency room] poor [sic] for convicts," where Doe Doctor (who worked for UMC, a public hospital connected to a state university) treated him, is insufficient to establish Doe Doctor is a state actor. *See, e.g.*, *Luna v. Victoria Cnty. Jail*, No. 6:21-CV-17, 2021 WL 4192741, at *7 (S.D. Tex. Sept. 15, 2021) (recommending dismissal of detainee's deliberate indifference claim against private emergency room doctor working for local hospital, where detainee alleged no facts supporting a finding that doctor acted under color of state law), *R. & R. adopted by* 2021 WL 5087145 (S.D. Tex. Nov. 2, 2021); *Doe v. Steward Health Care Sys. LLC*, No. 4:18-CV-00394, 2018 WL 4233816, at *7 (S.D. Tex. July 31, 2018) (finding plaintiff had not pleaded facts demonstrating doctor or hospital "carried out a function that is traditionally performed by the state" when they discharged and transferred plaintiff to jail in accordance with an attachment order), *R. & R. adopted by* 2018 WL 4232921 (S.D. Tex. Sept. 5, 2018). That is, Melendez maintains that upon arrival at the emergency room, Doe Doctor treated him, but Melendez does not contend that Doe was an employee of the hospital (as opposed to an independent contractor), or that Lubbock County Detention Center otherwise had a contract with UMC such that Doe's actions are fairly attributable to the state. *Cf. Bishop v. Karney*, 408 F. App'x 846, 848 (5th Cir. 2011) ("A private doctor *under contract with a state prison* to provide medical care to prisoners is considered a state actor because his action in providing medical care to prisoners is fairly attributable to the state." (emphasis added)); *Veal v. Wilkinson*, No. 10–CV–1013, 2010 WL 4220546, at *2 (W.D. La. Sept. 23, 2010) (observing that it was unclear whether "treating physician at Louisiana State University hospital who operated on

[prisoner's] toe" was a state actor), *R. & R. adopted by* 2010 WL 4177492 (W.D. La. Oct. 20, 2010).

Even if Doe Doctor is a state actor, however, Melendez has failed to plead sufficient facts to state a viable deliberate indifference claim. First, Melendez pleads no facts supporting the conclusion that the shoulder pain, knee abrasion, and any migraine resulting from a "head problem" constituted serious medical needs for which he could state an actionable claim. *See Hinson v. Bias*, 927 F.3d 1103, 1122 (11th Cir. 2019) (stating that "skin abrasions" and a bruised knee did not amount to a serious medical need); *Vasquez v. Baca*, 323 F. App'x 503, 504 (9th Cir. 2009) (affirming district court's dismissal of detainee's "deliberate indifference claim because his allegations concerning treatment of a cold, a migraine, and athlete's foot did not implicate a serious medical need"); *Gobert*, 463 F.3d at 345 n.12 ("A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."); *Billizone v. Jefferson Par. Corr. Ctr.*, No. 14–1263–SS, 2014 WL 7139636, at *2 (E.D. La. Dec. 15, 2014) (dismissing plaintiff's deliberate indifference claim in part because his "back pain and shoulder pain simply do not rise to the level of serious medical needs" (internal quotation marks and citation omitted)).

Further, even if Melendez's medical conditions constituted serious medical needs, he has not pleaded facts demonstrating that Doe Doctor acted with deliberate indifference. Melendez alleges that he told Doe Doctor he "had a head problem," as well as shoulder pain and an abrasion on his left knee. Questionnaire 3. Other than reporting the foregoing, however, Melendez concedes that he did not communicate any specific facts to Doe Doctor concerning his purported injuries.[8] Questionnaire 3 (stating that he did not communicate with Doe Doctor). And as to his

---

[8] Melendez denies that Doe Doctor performed any treatment or observation. Questionnaire 4. The authenticated medical records, on the other hand, reflect that Doe Doctor perceived Melendez as being "alert" and observed a "small

14

alleged "head problem," Melendez acknowledges Doe Doctor examined Melendez's eyes, presumably to determine whether Melendez had in fact suffered a head injury in the motor vehicle accident. Questionnaire 4.

Melendez's bare report of injuries, standing alone, does not demonstrate that Doe Doctor knew of and disregarded an excessive risk of harm. *See, e.g.*, *Hines v. Henson*, 293 F. App'x 261, 263 (5th Cir. 2008) (explaining that detainee failed to state a constitutional claim where he did not "show that he complained of his condition or requested medical assistance, nor [did] he offer[] evidence showing that his medical condition was apparent and clearly necessitated medical care"); *Estrada v. Nehls*, 524 F. Supp. 3d 578, 591–92 (S.D. Tex. 2021) (rejecting prisoner's deliberate indifference claim based on allegation that nurse provided only cursory medical care, where prisoner did not allege facts showing nurse "was aware of facts from which an inference could be made that he required more than the medical care he was provided," that she "drew the inference that [prisoner] faced a substantial risk of serious harm and disregarded that risk," or that he presented with visible injuries, though he claimed being in pain); *Guillory v. La. Dep't of Health & Hosps.*, No. 16-787-JWD-RLB, 2018 WL 1404277, at *12 (M.D. La. Mar. 20, 2018) (dismissing prisoner's claim against nurse, where although he alleged he reported significant pain and difficulty breathing, prisoner pleaded "no facts to indicate that [nurse] actually drew an inference of substantial serious risk of harm and then denied [prisoner's] request for a transfer to the hospital in the face of that risk").

Further, to the extent Melendez believes Doe Doctor should have ordered additional diagnostic tests such as x-rays or an MRI to evaluate a possible head injury, Melendez's claim amounts to an unactionable disagreement in medical care. *Estelle v. Gamble*, 429 U.S. 97, 107

---

abrasion" to Melendez's left knee. Doe Doctor also did not see any swelling, and documented Melendez as having "normal" range of motion to his left shoulder.

(1976) (explaining that the decision whether to order "an X-ray or additional diagnostic techniques or forms of treatment . . . is a classic example of a matter for medical judgment" and the decision not to do so "does not represent cruel and unusual punishment"); *Peace v. Norwood*, No. 7:19-cv-00116-M-BP, 2021 WL 1379555, at *6 (N.D. Tex. Mar. 18, 2021) ("[Prisoner's] claim that nursing personnel denied him an emergency x-ray that he needed does not establish [defendant's] deliberate indifference. At most, it establishes his disagreement with the medical treatment he received, which does not state an Eighth Amendment claim."), *R. & R. adopted by* 2021 WL 1378778 (N.D. Tex. Apr. 12, 2021). At best, Melendez's allegation that Doe Defendant should have provided different, or additional, treatment may amount to a claim for negligence or medical malpractice, but such a claim is not actionable under § 1983. *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (explaining that "[u]nsuccessful medical treatment . . . negligence, neglect or medical malpractice" are all unactionable under § 1983 (internal quotation marks and citation omitted)).

Construing Melendez's claim as one for a delay in medical care requires no different result. Melendez states, and the authenticated records reflect that he received medical care (e.g., ibuprofen) for the headaches within a few days of arriving at Lubbock County Detention Center. Questionnaire 4. He pleads no facts showing that the delay between Doe Doctor's examination at the hospital and his ultimate receipt of ibuprofen resulted in substantial harm. *Id.* Without a showing of substantial harm in connection with the delay, Melendez cannot state a claim. *Haddix v. Kerss*, 203 F. App'x 551, 553 (5th Cir. 2006) ("[Prisoner] has not shown that he faced a substantial risk of serious harm from the occasional denial of pain medication . . . . The result of the defendants' actions was unrelieved, pre-existing, back and shoulder pain, not a worsening of his condition or other serious harm." (internal quotation marks omitted)); *Cudjo v. Hammond*, No.

6:15cv1162, 2019 WL 1119364, at *9 (E.D. Tex. Feb. 12, 2019) ("Plaintiff has failed to demonstrate that the delay in receiving his medication for his migraines resulted in any substantial harm."), *R. & R. adopted by* 2019 WL 1112038 (E.D. Tex. Mar. 11, 2019); *Williams v. Dallas Cnty.*, No. 3–01–CV–0400–D, 2003 WL 21662823, at *3 (N.D. Tex. July 14, 2003) ("Although [prisoner] did not receive pain medication . . . for more than two months after his initial request, there is no evidence that this delay was the result of deliberate indifference on the part of any defendant or caused substantial harm."), *R. & R. adopted by* 2003 WL 22359487 (N.D. Tex. Sept. 9, 2003).

For these reasons, the undersigned recommends the district judge dismiss Melendez's deliberate indifference to serious medical needs claim.

### D. Melendez cannot state a cognizable claim against KLBK, KCBD, and Lubbock Avalanche because they are not state actors and, to the extent Melendez intends to raise state-law claims, the Court should not exercise supplemental jurisdiction.

Melendez contends that KLBK, KCBD, and Lubbock Avalanche inaccurately reported that he was a suspect in several ATM robberies and wrongfully referred to him as the "ATM Bandit." Compl. 5, 9; Questionnaire 4. According to Melendez, these purported defamatory statements "caused [him] to not be able to find a job once [he] wuz [sic] released." Compl. 5.

"Damage to an individual's reputation as a result of defamatory statements made by a *state actor*, accompanied by an infringement of some other interest, is actionable under § 1983"—i.e., the "stigma-plus-infringement" test. *Cormier v. Lafayette City-Par. Consol. Gov't*, 493 F. App'x 578, 584 (5th Cir. 2012) (alteration omitted) (emphasis added) (quoting *Texas v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995)). In this case, it appears that KLBK and Lubbock Avalanche are private media outlets—not state actors—and Melendez pleads no facts suggesting that they otherwise acted under color of state law. *See Lavergne v. Turk*, 583 F. App'x 367, 368 (5th Cir.

17

2014) (affirming district court's dismissal of prisoner's § 1983 claims against "Independent Media Group" because such defendant was not a state actor); *Xuan v. Fort Worth Star Telegram*, 277 F. App'x 452, 453–54 (5th Cir. 2008) (explaining that "acts of private parties, such as the [Fort Worth] Star–Telegram, even if wrongful, do not fall under the ambit of the Constitution" and therefore affirming dismissal of plaintiff's § 1983 libel claims based on allegation that the newspaper reported plaintiff "was a reputed Asian gang leader" (internal quotation marks and citation omitted)). For this reason alone, the undersigned recommends that the district judge dismiss Melendez's defamation claims. *See, e.g., Davis v. Wilson*, No. 17-1269-P, 2021 WL 1619357, at *5 (W.D. La. Mar. 11, 2021) (recommending dismissal of plaintiff's § 1983 defamation claims against local media, which were "private citizens/entities, and Plaintiff [did] not offer any plausible allegations to establish that they acted under color of state law"), *R. & R. adopted by* 2021 WL 1619348 (W.D. La. Apr. 26, 2021); *Kemp v. Belanger*, No. 19-0799, 2019 WL 8759431, at *15 (W.D. La. Oct. 15, 2019) (recommending dismissal of plaintiff's defamation claim against defendant media outlet, where defendant did not act under color of state law by "either falsely report[ing] that he was arrested under a fugitive warrant or falsely indicat[ing] that Plaintiff was a fugitive"), *R. & R. adopted by* 2020 WL 2516575 (W.D. La. May 15, 2020).

To the extent Melendez raises state law claims for defamation, the undersigned recommends that the Court decline to exercise supplemental jurisdiction. Under 28 U.S.C. § 1367, a district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Because the undersigned has recommended that all of Melendez's federal claims be dismissed, the Court should decline to exercise § 1367 supplemental jurisdiction and dismiss without prejudice any state law claim for defamation. *See, e.g., Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 455

18

(5th Cir. 2001) (noting that a "district court may refuse to exercise supplemental jurisdiction" over state law claims where court dismisses claims giving rise to original jurisdiction); *Gros v. Walker Cnty. Hosp. Corp.*, No. H-17-1138, 2019 WL 3996869, at *1 (S.D. Tex. Aug. 22, 2019) ("Because no federal claims remain, this court declines to exercise supplemental jurisdiction over the state law defamation and breach of contract claims."); *Slegelmich v. Pearl River Cnty. Hosp. & Nursing Home*, No. 1:14CV409-LG-RHW, 2015 WL 13357603, at *7 (S.D. Miss. Dec. 14, 2015) (declining to exercise supplemental jurisdiction over plaintiff's state law claims, including one for defamation, where the court had dismissed plaintiff's § 1983 claims).

### III.   Recommendation

For these reasons, the undersigned recommends that the United States District Judge dismiss with prejudice Melendez's Complaint and all claims therein, except for any state law claim for defamation, which should be dismissed without prejudice.

### IV.   Right to Object

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2016); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding, conclusion, or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district

court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: November 16, 2021.

_____
D. GORDON BRYANT, JR.
UNITED STATES MAGISTRATE JUDGE